**No. 6:20-cv-429-WWB-GJK**

---

**In TheUnited States Court of Appeals for the Eleventh Circuit**

---

**Evrett James,  et al**

Plaintiff

**Vs**

**Westin St John Hotel Company, Inc**

Defendant

Appeal from a summary judgment of

---

The plaintiffs contend that the court eliminated their claim for retaliation when there was competent substantial evidence to support it. We affirm `the finding of liability for racial discrimination and retaliation claims, because the Middle District Court erred in carefully examining the evidence granting the motion for dismissal in summary judgement.

---

Evrett James
Veronica Ellerbe
3883 Carrick Bend Dr
Kissimmee, Fl 34746
Evhousingll@gmail.com
Vibesbruja@gmail.com
904-625-8885
305-570-6350
Pro Se

# Table of Content

**Page**

**Table of Authorities**……………………………………………………………………**2**

**The Jurisdictional Statement**……………………………………………………**4**

**Issue Presented**……………………………………………………………………...**5**

**Statement of the Case**……………………………………………………………**6**

**Statement of Facts**…………………………………………………………………**13**

**The Argument**………………………………………………………………………**24**

**The Conclusion**……………………………………………………………………..**36**

**Certificate of Compliance**………………………………………………………**37**

**Certificate of Persons of Interest**……………………………………………**38**

# TABLE OF AUTHORITIES

**Cases**                                               **Page**

Alvardo v. Bd. of Trustees of Montgomery College, 928 F.2d 118 (4th Cir. 1991)33

Bass v. Bd. of County Comm'rs, 256 F.3d 1095 (11th Cir. 2001).........................34

Babbitt, et al. v. Albertson's 2011……………………………………….…20, 34

Carter v. Three Springs Residential Treatment, 132 F.3d 635 (11th Cir. 1998),32,33

Clark v. Huntsville City Bd. of Educ., 717 F.2d 525 (11th Cir. 1983) …………..34

Cuddy v. Carmen, 694 F2d 853(D.C)1982…………………………………….29

EEOC v. Sears Roebuck & Co., 243 F. 3d 846 (4th Cir. 2001).........................20,30

Furnco Const. Corp. v. Waters, 438 U.S. 567 (1978).......................................21,27

Hodgens v. General Dynamics Corp., 144 F.3d 151 (1st Cir. 1998).....................26

Kearney v. Pyramid Mgmt. Group, Inc.,  200 WL, 744000 (2000).......................30

Kerzer v. Kingly Mfg., 156 F.3d 396 (2d Cir. 1998).........................................20,31

Lane v. Ogden Entertainment, Inc., 13 F.Supp.2d 1261 (M.D. Ala. 1993)............32

Lewis v. City of Union City, Georgia, 918 F.3d 1213 (11th Cir. 2019)................28

McClain v. Lufkin Industries, Inc., 187 F.R.D. 267 (E.D. Tex., 1999)..................21

Melnyk v. Adria Laboratories, 799 F.Supp. 301 (W.D. N.Y. 1992).......................26

Millbrook v. IBP, Inc., 280 F.3d 1169 (7th Cir. 2002)...........................................27

Mechnig v. Sears Roebuck & Co., 864 F.d 1359 7th Cir 2002…………………..27

O'Bannon v. Friedman's Inc.2004………………………………………….20,34

Postal Serv. Bd. of Gov. v. Aikens,  460  U.S. 711 (1983)....................................31

Rose v. Nat'l Cash Register Corp., 703 F.2d 225 (6th Cir. 1983).....................20,31

Rosen v. Thornburgh, 928 F.2d 528 (2d Cir. 1991).................................................26

Stern v. Trustees of Columbia Univ., 131 F.3d 305 (2d Cir. 1996).......................28

Sheehan v. Donlen Corp., 173 F.3d 1039 (7th Cir. 1999).......................................25

Smelter v. Southern Home Care Services Inc, 43 (M.D. Ga. 2016).......................7

Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318 (11th Cir. 1998)....................29

Walker v. Mortham, 158 F.3d 1777 (11th Cir. 1998)..............................................32

Yarbrough, et al. v. Glow Networks, Inc., 2019 (Civil No. 4:19-cv-00905, E.D.

Tex. 2019………………………………………………………………………….24

United States Postal Serv. Bd. of Gov. v. Aikens, 460 U.S. 711 1983………...29,31

 411 U.S. 792 (1973).................................................................................................25

 **Statutes**

Civil Rights Act of 1964 § 7, 42 U.S.C. § 2000e et seq (1964)..........................

Equal Pay Act 1963 (EPA) (29 U.S.C., Chapter 8 sec. 206(d))............................6

The Florida Civil Rights Act (FCRA)..........................................................7,22,28

Florida's Fair Employment Law Title 41 Section 448.103…………………5

Florida Statute Title VI Section 59.04 …………………………………..4

42 U.S. Code § 1981…………………………………………………..5

Human Rights Act of 1977, Section 23.161………………….…………11

## JURISDICTIONAL STATEMENT

Plaintiffs attest the United States Court of Appeals for the Eleventh Circuit had subject matter jurisdiction under Florida Statute Title VI Section 59.04 over Appeal No. 22-12327-A, Case No; 6:20-cv-429-WWB-GJK The Plaintiffs timely filed a notice on July 14, 2022. Appealing Judgment in favor of Defendant to

dismiss in Summary Judgment.  The district court's jurisdiction, arguing Plaintiffs lacked standing and that their claims were not ripe.

## **The Issue Presented**

Under Title VII of the Civil Rights Act of 1964 and  42 U.S.C. § 1981, can Westin St. John Hotel Company, Inc., ("Westin St. John") excuse and allow harassment in the workplace to protected classes under state and federal law that is so severe or pervasive that it creates a hostile work environment? When they repeatedly dismissed claims of  harassment, retaliation and hostile work environment as exaggerated and frivolous?  While the law doesn't prohibit simple teasing, offhand comments, or isolated incidents that are not very serious.  Can Westin St. John overlook  harassment when it is so frequent or severe that it creates a hostile or offensive work environment or when it results in an adverse employment decision (such as the victim being fired or demoted) such as the case with James being demoted and eventually fired after reporting such actions? Whether Westin St.John  allowed its management to make decisions that go against its policies and procedures to undermine the company productivity to allow its management to harass and retaliate against employees as it did on several

occasions with Plaintiffs  of both protected classes? Whether an employer allows its management team free reign to use a racial slur and racial epithets to humiliate, intimidate and harass employees of a protected class?  Can under Florida's Fair Employment Law, Westin St. John  elect not to  observe the terms of bona fide seniority systems because an employee is of a protected class even when the

employee is the top producing sales executive worldwide in the company exceeding their bona fide job requirements? Can under The Equal Pay Act (EPA) an employer refuse to pay an employee  of a protected class earned commissions and bonuses while still employed;  allowing the pay and metrics to apply towards the management who is responsible for harassment of the same employee as a form of intimidation or retaliation?

### The Statement of the Case

The theory of this case is that implicit bias is a mental process that stimulates negative attitudes about people who are not members of one's own "in group" leads to discrimination against people who are not members of one's own racial group.  As the Westin St. John's sales executives team has a history of hiring exclusively white employees having two non white employees transfer from within the company simulateously triggered their management who had been in place for over 10 years collectively to react adversely through discriminatory and harrassing

6

actions. Furthermore, creating an environment where microaggression and stereotypes are allowed to enforce a toxic company culture.  Ellerbe having worked for the company at another site reported claims of discriminatory actions  as early as the first week of transferring to Westin St.John in December of 2018.  Where a member of management Cheryl Grimes (Grimes)(White) was allowed to humiliate and beriate her in front of the entire sales team for simply not memorizing the sales script within a few hours.  When she reported it to the Director that same manager immediately retaliated  against her by calling the Regional Vice President, Regis Hollander("Hollander") with an attempt to label  Ellerbe as a "troublemaker" to upper management.  From that date in late 2018 until the October 2019 incident when she used a racial slur; the N-word directed at Ms. Ellerbe during a training session.  In Brenda Smelter v. Southern Home Care Services, Inc., d.b.a. Rescare Homecare, the Eleventh Circuit addresses those questions. First, the court comes close to saying that the one incident with the racial epithet could be sufficient. Do not assume one time isn't enough to make it a federal case.

Ms Ellerbe was subject to constant microaggression and harassment from the same manager repeatedly even though she consistently sought administrative remedy through corporate human resources. In fact both plaintiffs sought some sort of administrative remedy through Westin St. John  and its parent company Marriott Worldwide at least 50 times through documented emails, texts and phone

conversations and in-person interviews and conferences  in the span of one year. As frequently as 4.6 times a month which equates to once a week while employed at Westin St. John.  In Smelter v. Southern Home Care Services Inc, 43 (M.D. Ga. 2016), the Eleventh Circuit  decided that:

> "(1) The frequency of the conduct – Eight comments in the two months was sufficiently frequent.
>
> (2) The severity of the conduct – The negative comments about black people made around Ms. Smelter, capped off with the epithet directed to her on her last day, were sufficiently severe.
>
> (3) Whether the conduct is physically threatening or humiliating, or a mere offensive utterance – Although the conduct was not necessarily physically threatening, the daily racial comments were sufficiently humiliating.
>
> (4) Whether the conduct unreasonably interferes with the employee's job performance -Although Ms. Smelter had little or no evidence that the conduct interfered with her work performance, "considering the totality of the circumstances, particularly the daily frequency and extreme severity of the harassment, including racist remarks made directly to Smelter about her" the other three factors sufficed."

This constitutes it being pervasive that it causes a hostile, abusive, or intimidating work environment. The fact that both plaintiffs were previously employed at different locations within the company under the same titles without incident should reflect the merit in which they were able to perform their duties.  Mr. James has been employed within the company for over 5 years without incident. He was employed at Westin St. John prior to its closure due to environmental disasters in 2017 under a different Director.  Proving that the management team was only allowed to enact its discriminatory pratices under the leadership of Rebecca Sosa (formerly El Korchi) ("Sosa") (White) sales & marketing director, the person who also was in charge of  allegedly investatgeting most of the planitffs claims deciding them frivolous or out right rejecting them.  Even when white employees noticed these actions and reported racial harassment towards the plaintiffs backing up their claims they were dismissed.  When white sales executives Sarah Bigelow ("Bigelow") and Andrew Smalley ("Smalley")  reported racial slurs directed towards the plaintiffs and other protected classes  they were discouraged from being allies with the plaintiffs and encouraged to not associate with the "troublemakers."   Examples of implicit bias in the workplace include skewing results of a performance review to favor employees from the same personal and demographic background in order to retaliate against, discriminate or penalize the plaintiffs.   Westin St.John Hotel  refused to recognize or combat these

discriminatory biases and used its human resources department to gaslight the plaintiffs by overlooking their claims and using people who do not themselves experience these situations to investigate them.  How can you address something you're untrained in or do not personally experience? How can you investigate claims without interjecting your own implicit bias and them having an effect on your determined outcome?  If the accused actions align with your ingrained core values can you properly investigate the claims of a particular group that you do not identify with?  When sales manager George Markowski ("Markowski")(White) made a comment to plaintiff James that he had to listen to him because he was a white male did that reflect his discriminatory bias?  A supervisor's derogatory or demeaning statements about an employee's race, or national origin may not be just harassing, but also might reflect the supervisor's views or a company policy that the employee is less qualified and thus should be paid less or not promoted.  Most organizations have these problems.

The plaintiffs repeatedly followed the company's chain of command and responded as any employee would to seek remedy in a career they both employed. They both just wanted to feel comfortable in a work environment conducive to them being able to perform their duties.  Instead, the opposite was allowed to prevail. Systemic racism and discrimination in workplaces can be so embedded that it often is assumed to reflect the natural, inevitable order of things.  When only the

black employees find their desk and personal items ransacked, overturned, are they making trouble by expressing dismay and reporting it or would that be the natural response? Sosa of Westin St. John Company would dismiss these claims as an exaggeration or frivolous.  Out of all complaints Westin St.John Company and Sosa allegedly investigated they never, once agreed with or decided in favor of the plantiffs. In fact Sosa would delusionally claim that James received more favorable treatment because he would be constantly  recognized as the top producer throughout the company despite this recognition being earned completely based on performance.  Sosa saw it as favorable treatment due to her implicit bias and not as something he earned through hard work.  Having to acknowledge that fact was seen as "favorable" treatment in her eyes despite it being a material fact.  Is that the smoking gun of discrimation and implicit racial bias?  They inherently viewed the plaintiffs negatively and warranted their claims unworthy and impossible to be true. The smoking  gun being refusing to pay James for millions of dollars in volume earnings while allowing his earnings to be rotationally distributed through pay to white management is not only unethical and discriminatory but illegal.  The smoking gun is not allowing Ellerbe to seek specialty clients citing the Policies and Procedures as the reason while allowing  Smith to increase his pay  bypassing those same Policies and Procedures in his favor. It is allowing sales executive Shonin Corbel ("Corbel")(White) to close his own deals while denying it to

Ellerbe. It will be the documented countless company emails expressing their day-to-day plight at the resort to no avail.  The Human Rights Act of 1977, Section 23.161 et seq., prohibits unfair employment practices discriminating "with respect to compensation, terms, conditions, or privileges of employment, because of  race." Section 23.167(1)(a).

The smoking gun is Westin St. John Hotel allowing Sosa and the sale executive management team( White) to repeatedly  use erred progress reports for targeted  retaliation as discriminatory discplinary actions towards the plaintiffs essentially causing them to lose thousands of dollars monthly based on errors. This harassment was continuous and disseminated  by a team of supervisors and resulted in negative employment action, holding the employer, Westin St. John liable.  This being unreasonable harassment interfered with the plaintiffs' work performance by creating an environment that was intimidating, hostile, retaliatory subjecting the plaintiffs to increased targeted scrutiny.   A hostile work environment is commonly the result of discrimination claims.  Where there is one there is the other, the hostile environment often being the result of discrimation claim.

12

## The Statement of Fact

As sales executives, Plaintiffs were responsible for selling time-share and other vacation opportunities to established owners and other Westin guests by making sales pitches, known as "tours," to guests. Sales executives are tasked with presenting a number of different types of tours.  – referred to as "lines" – The Line Philosophy as stated on page 35 of the Standard Operating Procedures Handbook (that rules and governs sales executives) states the policy ensures consistency and rewards those producing high efficiencies and generating the most cost-effective sources of business.  Additionally,  this policy provides rewards to those Sales Executives that are selling and want to keep that winning momentum.  Sosa would go against the core of the company's philosophy to encourage counterproductive measures to discriminate against and target the company's top producer James because of his race.

James started work for the company in March of 2014 in Mrytle Beach, SC and never experienced discrimination until working under Sosa and her management team. Sosa,  Markowski and Grimes have worked and lived on the

small island of St. John, USVI for over a decade together.  They were friends

outside of employment  as well as colleagues and saw the introduction of new sales

executives as a direct threat to their  "Good Ole Boys" system management style.

They would rather jeopardize the overall productivity of the entire Sales and

Marketing department at Westin St. John rather then see the #1 sales executive be

black and have other successful black executives as it was completely foregin to

their management careers at Westin St. John.  Before Sosa was the Director of

Sales she was the Director of Marketing where she has a long stating history of

discriminatory pratices against a black veteran employee and island native named

Karen Powell ("Powell") . Powell will attest to years of racial discrimation as well

with discriminatory remarks made by Sosa and Grimes in her 15 years of

employment at the Westin St. John.  Powell felt too intimidated to report it as they

were both her direct superiors ultimately, forcing her to resign from her position of

over 15 years .  Several other black marketing executives will  attest to the

discriminatory history under  Sosa as the Marketing Director occurring

simultaneously  with the plaintiffs' claims. In fact while she was acting duly as the

director for sales and marketing upon the reopening. Black marketing emplyoees

will attest to her creating the similar hostile work environment and discriminating

practices against them as well.

In the case of James; he had established excellent VPG numbers in Myrtle Beach, SC and Orlando, FL where he was working in 2018  and was asked to come back to St. John because of such numbers. In fact, in 2017, he  was the number one sales representative at Westin St. John Hotel Company before hurricane's Irma and Maria closed down the resort.  In 2018 while working in Orlando, Fl he was solicited  to transfer back to St. John to help get the resort back to its normal standards. He was informed by Sosa and Hollander that the plaintiff would not lose his 096 tour privileges that he worked so hard to achieve as it would be a dealbreaker for him, making it pointless at all to go back. to help Sosa get things started again. Sosa stated that she gave the plaintiff a privilege to take 096 tours because the company had faith in his ability when in fact he earned this privilege by working hard for years and getting the product knowledge needed to take 096 tours.  It was also negotiated as a part of James' specified term to return. Company-wide, sales persons had to wait 6 months (as stated in the company's Standard Operating Procedures Handbook"SOP" that governs sales executives) to take 096 tours because 096 tours are complex owners who usually own multiple products from the company and representatives must prove that they have the VPG numbers and experience to take them. 096 tours are not the easiest tours and representatives must have plenty of experience and product knowledge to close

these sales in most cases. That's the reason representatives have to have excellent numbers for at least 6 months to take them.

James would have never uprooted his family from Orlando to St. John unless this was intact. Sosa also claims that when she eliminated 096 numbers to count towards VPG that she had a sales meeting with all the sales representatives in attendance to tell them she was eliminating these numbers but this is false. She blatantly lied as attested by both defendants and several other white employee allies John D`Angelo("D'Angelo")and Adam Schiller("Schiller"). There were only 8-10 Sales Executives at any given time this would constitute half stating Ms. Sosa lied. Sosa also stated when she implemented this discriminatory change she did not formally revise the SOP that governs the 096 tours and was not required to do so. The biggest question here should be why didn't she? Rebecca clearly changed the standard operating procedures in the same month of April because it is dated at the bottom of the standard operating procedures citing a revised date of April 18, 2019. Why wouldn't she put this important change in the standard operating procedures when this is the 1st time in company history that a change like this has ever been made and would affect everyone's numbers?  The reason for this is because it was based on racial discrimination and bias and was done so to target James specifically as James formally started reporting racist behaviour from manager Markowski as early as March 2019; Markowski tried to get James written up and

terminated for being insubordinate and aggressive when James knew the tour George was trying to assign him was not his. Markowski did not like that James was questioning his authority as a Decision Maker. Whenever James expressed concerns Markowski would expose his implicit racial bias by trying to make him seem angry or aggressive when that couldn't be further from the truth.

Historically, at no other resort had this been done and if she would have told sales representatives she was changing numbers everyone would have complained to corporate and human resources. The SOP states that management in certain cases can change tour flow but not numbers. By taking this action she is blatantly manipulating the incentive for coming to work at all which is to provide for families and livelihood given that the US Virgin Islands is one of the most expensive places to live in the country.  Imagine setting a goal and  working hard to reach and attain the goal and then someone being able to change that any time they wanted so they could intimidate and reflect their implicit bias. In fact, when James figured out what was going on he immediately informed Hollander, and he changed the policy back the very next day because he knew what Sosa was doing was against company standards and policy procedures. Sosa never actually informed Hollander of this change because she knew she couldn't provide logical sound reasoning for this drastic and abrupt change. Sosa never updated the

SOP to reflect this change, she never posted this on any company memos or emails like she did for everything else and she never had a sales meeting with all the sales representatives to let them know because that would start an array of complaints from all the sales representatives. James had the highest VPG (volume per guest) in the company for 096 tours and Sosa eliminated those numbers, the person who would suffer the most from this change is James making such targeted discrimation blatant. Sosa knew for a fact that if she eliminated 096 tour numbers, for which James had the highest in the entire company, that it would in fact affect only him the most. It would also make Westin St. John the only resort in the company enforcing such new changes. She didn't care about the overall productivity of Westin, she cared about discriminating against the top sales executive because he's black. All sales reps weren't eligible to take 096 tours. The agenda was clear to secretly eliminate all 096 numbers in order to racially discriminate against James who was at the time the #1 sales executive in the entire company Worldwide and to give other white sales representatives an opportunity they hadn't earned or achieved. Of course the trickle-down effect would eventually affect other reps but in its inception it was racially motivated at its core and it was her making employment decisions on the basis of race in the workplace. Sosa also claims to have given James front to back privileges in which he was allowed to close his own deals without the assistance of management and earn an extra percentage in

pay by doing so, when in fact it was due to Mr James elite product knowledge that was better than management due to the fact James had worked at several different resorts in the company and excelled at all of them. James realized this wasn't actually a privilege at all as James was being used to not only make it appear that the managers had been producing at a higher volume than they actually were but also because they were being paid for James's front to back work and splitting the money between management instead of paying James his percentage of commissions. James was being subjected to wage discrimination as well.

Company-wide front to back sales

Executives  (executive who close their own sales unassisted by management)  are given an extra percentage if they close their own deals without the assistance of managers. James never received any pay or bonuses after closing millions of dollars in sales. In fact,  Sosa set in place a system where every deal James sold was distributed to management on a rotation blatantly engaging in wage discrimination and making the managers wealthy by paying them James commission and bonus for work they hadn't done. James' work also contributed to many accolades managers would have received because they had budgeted metrics standards as well. Oftentimes James work would save their jobs when they were not meeting their performance standards as managers. While never promoting James to a management position even though James did the work of

19

management. When they needed another manager James officially asked to apply with Sosa (Lane v. Ogden Entertainment, Inc., 13 F.Supp.2d 1261 (M.D. Ala. 1993), was used as a "floating manager" when they were short staffed; closed deals for other sales executives as well as trained new hires and they still outsourced and hired someone else, Dan Nicholas ("Nicholas")(White) without much resort and product knowledge. Bass v. Bd. of County Comm'rs, 256 F.3d 1095 (11th Cir. 2001), Clark v. Huntsville City Bd. of Educ., 717 F.2d 525 (11th Cir. 1983). James was also never compensated for his deals closed with other sales executives(.E.E.O.C. v. Sears Roebuck & Co., 243 F.3d 846 (4th Cir. 2001), Kerzer v. Kingly Mfg., 156 F.3d 396 (2d Cir. 1998),  Rose v. Nat'l Cash Register Corp., 703 F.2d 225 (6th Cir. 1983).  Management received 2% and higher commissions and bonuses from James's knowledge and hard work  Month after month they received thousands of dollars in pay from James work when James should have been compensated for that hard work. Babbitt, et al. v. Albertson's, O'Bannon v. Friedman's Inc.,. James asked Sosa repeatedly about when he would start receiving proper compensation for his millions in sales but was never paid or promoted. They continued to reap the rewards off the back of the top producing sales executive. Once James started to make formal complaints about not receiving this commission is when Sosa and management revoked James's earned front to back privilege. Management then tried to disguise it as complaints from owners. In all

the years of work for the company (as well as at Westin St. John previously) James never received as many complaints as he had in the last six months of his employment in Westin St. John. This can't go unnoticed and must be taken as targeted and blatant. If James would have not been so passionate about getting what was afforded and paid to others and being treated equally then they wouldn't have seen the need to formulate plans against James to seek his termination. James was so good at closing his own deals that it was management that gave him the nickname " The Inventory Specialist."  Sosa consistently committed perjury during her deposition stating "PMP reports are not viewed as disciplinary in nature" (Sosa Depo. at 12:11–13:8); when in fact they were used to demote, discipline and fire employees based on presumed performance.  However, these metrics were adjusted by Sosa to target plaintiffs. Page 24 of the Westin St. John SOP states performing

- "Under in 1 Time Period: Written Coaching

- Under in 2 Time Periods:  Final Warning with 30 days to meet MPS(Monthly performance standards)

- Under in 3 Time Periods Termination"


All disciplinary actions. Sosa's motivation to blatantly attempt to disguise this pertinent information during her deposition is to keep from admitting that by evaluating sales executives based on erred PMP reports was a way to threaten,

21

intimate and target Plaintiffs.  McClain v. Lufkin Industries, Inc., 187 F.R.D. 267

(E.D. Tex., 1999). Furnco Const. Corp. v. Waters, 438 U.S. 567 (1978), the U.S.

The Florida Civil Rights Act (FCRA)

Another contradictory admission of guilt during Sosa deposition is when

she admitted that new hire Kenneth Smith ("Smith") (White)  with more prior

industry experience was  " The first individual to "fall" from the 096 Line

following the policy change was Smith, who fell from the line in June of 2019 says

Sosa. See Sosa Dec. In fact Kenneth was ineligible to receive 096 tours until July

of 2019 as he didn't start employment until February 2019; , yet as Sosa stated he

had been previously taking them months prior and was not doing a good job.

Westin St. John SOP 2019 page 39 states:

> New Sales Executives not eligible for Explore"096" Rotation during
>
> the first six months of employment."

 What valid reason other than blatant discrimination was Smith, the new hire in

February, 2019 privileged  to take them in June of 2019? Yet,  Ellerbe was denied

this privilege (The Florida Civil Rights Act (FCRA)  because Sosa couldn't

stomach the idea of the only two black employees  taking the tour she considered

the easiest. Helping to maintain the racial income gap between white men and

black women as well as promoting intersectional workplace discrimination.

After complaining about multiple accounts of racism Sosa and management tried their hardest to lie to get James fired. Manipulating events, circumstances and documentation only they have the power and access to do. Markowski was caught attempting to falsify claims as it relates to James on at least two separate occasions. Each time Markowski lied on James, Sosa served James write ups which she later rescinded because James had multiple eyewitnesses at work come to his defense for these embarrassing and false accusations. Markowsi was proven to be a liar multiple times on several occasions but allowed to reign terror against James unchecked. Grimes also participated in attempting to defame James through the same methods used by Markowski as documented through several company files until his termination in early 2020.

In the case of Ellerbe she reported implicit racial/ethnic intimidation and bullying from the very first week of training from Grimes. It was reported immediately via the management team the chain of command on site as well as anonymously via the HR hotline.  She documented as many as five such incidents within the first 45 days of employment at Westin St. John. Grimes had an ax to grind with her  from the very beginning for no other reason than her being black causing her implicit racial bias to show every step of the way. Grimes went out of her way to go After Ellerbe who made several complaints to corporate and the EEOC about the retaliation against her and the intimidation became worse. Sosa

23

and Jessica Likens ("Likens") director of human resources  have a history in siding against and not properly investigating claims made involving black employees. It doesn't matter what was reported to either of them, they never believed them. Sarah Bigelow ("Bigelow") (White) also reported racial intimidation to HR against the black employees. HR and Rebecca took Sarah's claims unbiasedly and investigated thoroughly because it was now coming from someone who was white. This bullying would begin to take an emotional toll on Plaintiffs not only their work performance and work morale but their mental help as well as both Plaintiffs started seeking psychiatric therapy.  This also played a huge factor in Ellerbe's resignation. In regards to my decision not to return was due to the stress created from the experience of overt and subtle forms of discrimination. The experience of discrimination and racial bias while the other employees only had to focus on their productivity increased my anxiety, this affecting not only my confidence at work but my mental health as well, knowing that no matter what I experienced it would be belittled because of  plaintiffs race. The increasingly hostile like formal manifestations of discrimination, interpersonal discrimination reflects targeted (and often repeated) behaviors directed toward plaintiffs  because of their race.


### The Argument (Summary)

24

The case, Yarbrough, et al. v. Glow Networks, Inc., 2019 (Civil No. 4:19-cv-00905, E.D. Tex. 2019) numerous Black employees faced continuing race discrimination at work, including promotion denials, unequal pay, and a hostile work environment. A group of fourteen former employees of Glow brought this lawsuit to redress alleged violations of 42 U.S.C. § 1981. A court ruled that Glow Networks Inc. and its parent company, CSS Corp exposed some of its former Black employees (and one white by extension of his advocacy for his Black co-workers) to a hostile work environment. According to their complaint, numerous Black employees faced continuing race discrimination at work, including promotion denials, unequal pay, and a hostile work environment by alleged the company not only punished Black people for checking their phones while on the clock.  In which a Texas jury agreed.  Were the Plaintiffs subject to worse discrimination?  411 U.S. 792 (1973) asked: Is a complainant in an employment discrimination suit limited to those charges for which the Equal Employment Opportunity Commission found reasonable cause? In which the court answered "no."

448.103   Employee's remedy; relief.—

(1)(a)    An employee who has been the object of a retaliatory personnel action in violation of this act may institute a civil action in a court of competent jurisdiction for relief as set forth in subsection (2) within 2 years after discovering that the alleged retaliatory personnel action was taken, or within 4 years after the personnel

action was taken, whichever is earlier. As the U.S. Seventh Circuit Court of Appeals in Sheehan v. Donlen Corp., 173 F.3d 1039 (7th Cir. 1999) explained, "it would cripple enforcement of the employment discrimination laws" to insist that evidence in an employment discrimination case "take the form of an employer's statement to the effect that 'I'm [not promoting] you because you're in a protected group.' " As observed by the U.S. Second Circuit Court of Appeals in Rosen v. Thornburgh, 928 F.2d 528 (2d Cir. 1991), "an employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to discriminatory intent." Indeed, "smoking gun" evidence attesting to discriminatory intent almost never exists in today's sophisticated employment world. Instead, as the U.S. District Court for the Western District of New York in Melnyk v. Adria Laboratories, 799 F.Supp. 301 (W.D. N.Y. 1992) pointed out, "employment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence." Thus, as the U.S. First Circuit Court of Appeals explained in Hodgens v. General Dynamics Corp., 144 F.3d 151 (1st Cir. 1998), " 'smoking gun' evidence is [ ] not required to prove discrimination." Indeed, as the U.S. Supreme Court in the) pointed out, "[t]here will seldom be 'eyewitness' testimony as to the employer's mental process." Because an employer will almost never admit to a discriminatory motive or leave a paper trial illuminating a discriminatory motive when denying an employee a

promotion, discriminatory failure to promote cases almost always must be proven by circumstantial evidence.  To establish a prima facie case of discrimination in a promotional decision, as determined by the U.S. Eleventh Circuit Court of Appeals in Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318 (11th Cir. 1998), an employee must prove that: (1) he or she is a member of a protected class based on his or her race, color, national origin, sex, pregnancy, religion, disability, or age; (2) he or she applied for and was qualified for promotion; (3) he or she was not given the promotion; and (4) the position went to a person who is not a member of his or her protected class or the employer continued to attempt to fill the position after rejecting him or her for the position. In Furnco Const. Corp. v. Waters, 438 U.S. 567 (1978), the U.S. Supreme Court explained that "it is clear beyond cavil that the obligation imposed" by the federal anti-discrimination laws is "to provide equal employment opportunity for each [promotion] candidate."

Although the federal anti-discrimination laws seek to assure equality of promotion opportunities and eliminate discriminatory promotion decisions, employees continue to face substantial obstacles in their efforts to obtain promotion. Indeed, employees not only have to surmount discrimination when seeking career advancement, they also most overcome the employer-friendly approach adopted by many federal courts to the federal anti-discrimination laws. U.S. Seventh Circuit Court of Appeals in Millbrook v. IBP, Inc., 280 F.3d 1169

(7th Cir. 2002), declare that they do "not act as super personnel department that second-guesses employers' business judgments." Abdicating their role as an enforcer of the federal anti-discrimination laws, these courts, like the Seventh Circuit in Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359 (7th Cir. 1988), further declare that "no matter how medieval an [employer's] practices, no mater how high-handed its decisional process, no matter how mistaken the [employer's] managers, [the federal anti-discrimination laws] do[ ] not interfere." These courts, as observed by Justice Rosenbaum in his dissenting opinion in Lewis v. City of Union City, Georgia, 918 F.3d 1213 (11th Cir. 2019), "when interpreting the federal anti-discrimination laws.

As observed by the U.S. Second Circuit Court of Appeals in Stern v. Trustees of Columbia Univ., 131 F.3d 305 (2d Cir. 1996), although courts do not "second-guess" an employer's employment decision, the federal anti-discrimination laws compel courts to subject "the reasons" for an employer's employment decision "to strict scrutiny" in order to ensure that the decision was not the result of discriminatory animus. Title VII of the Civil Rights Act of 1964 (Title VII), which is federal law, protects employees from discrimination on the basis of race, color, national origin, sex, and religion. Under Title VII, failing or refusing to promote an employee because of his or her race, color, national origin, sex, or religion is an unlawful employment practice.

- The Florida Civil Rights Act (FCRA), which is Florida law, protects employees from discrimination on the basis of race, color, national origin, sex, pregnancy, religion, disability, age, and marital status. Under the FCRA, employers are forbidden from failing or refusing to promote an employee on the basis of race, color, national origin, sex, pregnancy, religion, disability, age, or marital status.

Employees denied promotion mistakenly believe that an employer must tell them they were not promoted because of their race, color, national origin, sex, pregnancy, religion, disability, or age in order to have legal grounds for bringing a discriminatory failure to promote case. Moreover, as observed by the U.S. D.C. Circuit Court of Appeals in Cuddy v. Carmen, 694 F.2d 853 (D.C. Cir. 1982), "employees and applicants for employment have great informational disadvantages" when attempting to prove discrimination in employment decisions because "they cannot reach into the minds of the decision-makers, and therefore can gather only circumstantial evidence of discriminatory motives." Indeed, as the U.S. Supreme Court in the United States Postal Serv. Bd. of Gov. v. Aikens, 460 U.S. 711 (1983) pointed out, "[t]here will seldom be 'eyewitness' testimony as to the employer's mental process." circumstantial evidence.

To establish a prima facie case of discrimination in a promotional decision, as determined by the U.S. Eleventh Circuit Court of Appeals in Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318 (11th Cir. 1998), an employee must prove that: (1) he or she is a member of a protected class based on his or her race, color, national origin, sex, pregnancy, religion, disability, or age; (2) he or she applied for and was qualified for promotion; (3) he or she was not given the promotion; and (4) the position went to a person who is not a member of his or her protected class or the employer continued to attempt to fill the position after rejecting him or her for the position.Even when the position is filled by a person who is a member of the rejected employee's protected class, courts, such as the U.S. Fourth Circuit Court of Appeals in E.E.O.C. v. Sears Roebuck & Co., 243 F.3d 846 (4th Cir. 2001), have determined that a rejected promotion candidate can still establish a prima facie case of a discriminatory failure to promote by showing that he or she: (1) is a member of a protected class based on his or her race, color, national origin, sex, pregnancy, religion, disability, or age; (2) applied for and was qualified for a promotion; (3) was not given the promotion; and (4) was not promoted under circumstances which give rise to an inference of unlawful discrimination.

As observed by the U.S. District Court for the Western District of New York in Kearney v. Pyramid Mgmt. Group, Inc., 2000 WL 744000 (W.D. N.Y. June 5, 2000), in determining whether the employer's promotion decision occurred under

circumstances which give rise to an inference of unlawful discrimination, courts look to "factors such as the employer's continued solicitation of applicants from people with qualifications similar to those of [the rejected promotion candidate], [discriminatory] language used to criticize the [rejected promotion candidate], disparaging comments about people in the [rejected promotion candidate's] protected class, more favorable treatment of other employees not in the protected group, and the circumstances" surrounding the employer's decision not to promote the rejected promotion candidate. Indeed, as the U.S. Supreme Court in the United States Postal Serv. Bd. of Gov. v. Aikens, 460 U.S. 711 (1983) pointed out, "[t]here will seldom be 'eyewitness' testimony as to the employer's mental process." Because an employer will almost never admit to a discriminatory motive or leave a paper trial illuminating a discriminatory motive when denying an employee a promotion, discriminatory failure to promote cases almost always must be proven by circumstantial evidence.

As the Second Circuit Court of Appeals observed in Kerzer v. Kingly Mfg., 156 F.3d 396 (2d Cir. 1998), a valid prima facie case creates "a presumption that the employer unlawfully discriminated against the employee." Thus, as explained by the U.S. Sixth Circuit Court of Appeals in Rose v. Nat'l Cash Register Corp., 703 F.2d 225 (6th Cir. 1983), "to say that an [employee] has established a prima facie case is simply to say that he has produced sufficient evidence to present his case to

the jury." Once a promotion candidate establishes a prima facie case of discrimination, the employer must articulate a legitimate, non-discriminatory reason for its promotion decision. If the employer demonstrates that it had a legitimate, non-discriminatory reason, the promotion candidate must show that the employer's proffered reason for the promotion decision is actually a pretext for discrimination. The promotion candidate may prove pretext by showing that a discriminatory reason more likely motivated the promotion decision or that the employer's proffered reason for the promotion decision is unworthy of belief.

Thus, as explained by the U.S. Eleventh Circuit Court of Appeals in Carter v. Three Springs Residential Treatment, 132 F.3d 635 (11th Cir. 1998), an employee seeking promotion is not required to establish that he or she possessed all of the qualities that the employer might prefer, but did not absolutely require, a promotion candidate to have.

In Walker v. Mortham, 158 F.3d 1777 (11th Cir. 1998), however, the U.S. Eleventh Circuit Court of Appeals squarely held that an employee seeking to establish a prima facie case of discriminatory failure to promote is not required to show, as part of a prima facie case, that his or her qualifications are equal or superior to those of the successful candidate.

Lane v. Ogden Entertainment, Inc., 13 F.Supp.2d 1261 (M.D. Ala. 1993). In that Title VII case, the employer argued that the employee claiming a race-based discriminatory failure to promote could not establish a prima facie case because she failed to apply for the job. In rejecting this argument, the U.S. District Court for the Middle District of Alabama found that the application requirement was satisfied because the employer had no formal posting system and the job itself was never posted. Under such circumstances, the court reasoned, the employer "had a duty to consider all of those who might have been interested" in the position and "a duty to consider" the employee denied promotion because "she had expressed an interest in the job."

U.S. Eleventh Circuit Court of Appeals in Carter v. Three Springs Residential Treatment, 132 F.3d 635 (11th Cir. 1998), it is "suspicious where it is alleged that established rules were bent or broken" to give the selected candidate "an edge" in the promotion process. U.S. Fourth Circuit Court of Appeals in Alvarado v. Bd. of Trustees of Montgomery College, 928 F.2d 118 (4th Cir. 1991). In that Title VII case, an employee claimed that he was denied promotion because of his race. The employer maintained a policy requiring employees seeking promotion to submit an application. The rejected employee submitted an application, but the selected candidate did not. The employer also maintained a policy of filling vacant positions with the employee who held the job on a

temporary basis. The rejected employee had held the position in question on a temporary basis and thus should have been promoted to fill the vacancy under the employer's own policy. Based on this evidence, the Fourth Circuit concluded that "it was more likely than not that a discriminatory reason motivated" the promotion decision because the employer violated its own personnel policies in selecting the successful candidate.

These principles are also illustrated in the decision by U.S. Eleventh Circuit Court of Appeals in Bass v. Bd. of County Comm'rs, 256 F.3d 1095 (11th Cir. 2001), where the court, in the context of an employer's violation of its own personnel policy, applied the principle that promoting a less qualified candidate is circumstantial evidence of discrimination.

The U.S. District Court for the Middle District of Alabama found that the application requirement was satisfied because the employer had no formal posting system and the job itself was never posted. O'Bannon v. Friedman's 8:03-cv-00623 The plaintiffs, represented by private counsel, sought equitable and injunctive relief, alleging that they had suffered a racially hostile work environment, discriminatory policies and practices, and a pattern or practice of race discrimination in hiring, promotion, compensation, and other terms, conditions, and privileges of employment.  Nevertheless, Babbitt et al v. Albertson's Inc.

remained as one of the landmark cases in the US racial discrimination law showing

that discrimination against race must not be tolerated in the workplace. The

decision by the U.S. Eleventh Circuit Court of Appeals in Clark v. Huntsville City

Bd. of Educ., 717 F.2d 525 (11th Cir. 1983) demonstrates than an employer's

failure to follow its own policy regarding a preference for present employees over

outside applicants can reflect a discriminatory motive. Title VII, and the FCRA

contain anti-retaliation provisions which protect employees from retaliation for

opposing an employer's discriminatory employment practices. Under these

anti-discrimination statutes, employees are protected from retaliation when they

complain about a perceived discriminatory promotion decision or perceived

discriminatory promotion practices. To be protected against retaliation under these

anti-discrimination laws, employees do not have to prove that they were denied

promotion based on a discriminatory reason. Instead, employees only have to show

that they had a good faith, reasonable belief that they were denied promotion based

on a discriminatory reason. In other words, employees are protected from

retaliation even if they are wrong about whether the failure to promote them

constituted an actual violation of the federal or Florida anti-discrimination laws.


### **Conclusion**

This Court should reverse the decision of the U.S Middle District Court of

Florida order which denied Plaintiffs' claims of discrimination.


Date: November 3, 2022


Evrett James

Veronica Ellerbe

3883 Carrick Bend Dr

Kissimmee, Fl 34746

Evhousingll@gmail.com

Vibesbruja@gmail.com

904-625-8885

305-570-6350

Pro Se

## CERTIFICATE OF COMPLIANCE

. 1. Type-Volume -Times New Roman  This document complies with the word limit of FRAP because, excluding the parts of the document exempted by FRAP 32(f) and , this document contains 7900 words. This brief complies with the line limit of FRAP because, excluding the parts of the brief exempted by FRAP 32(f) and , this brief uses a monospaced typeface and contains lines of text.

 2. Typeface and Type-Style  This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 3)2(a)(6).

Filed by:

Evrett James
Veronica Ellerbe
3883 Carrick Bend Dr
Kissimmee, Fl 34746
Evhousingll@gmail.com
Vibesbruja@gmail.com
904-625-8885
305-570-6350
Pro Se
November 3, 2022

## <u>Certificate of Interested Persons and Corporate Disclosure Statement</u>

AC Hotels

Aloft Hotel

Autograph Collection

Bulgari Hotel

Courtyard Hotels

Delta Hotels

Design Hotels

Edition Hotels

Element Hotels

Fairfield Inn & Suites

Four Points

Gaylord Hotels

JW Marriot

Le Méridien Hotels

Marriott International

Marriott Hotel & Resorts

Marriott Hotel Services Inc.

Marriott Vacation Club

Marriott Vacations Worldwide Corporation

Moxy Hotels

Protea Hotels

Sheraton Hotel and Resorts

Springhill Suites

Starwood Hotel & Resort

St. Regis

Renaissance Hotels

Ritz-Carlton Hotel Company

Ritz Carlton Reserve

The Luxury Collection

Tribute Portfolio

W Hotels

Westin Hotel and Resorts

Westin St. John Hotel Company, Inc